## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ERIKA ARNOLD, DEBRA TRAWICK, AND
CHRISTINE MUCHENE,

      Plaintiffs,

v.

ACCORD SERVICES, LLC, STEVEN A.
ADAMS AND KATAYOUN ("KATHY")
ADAMS,

      Defendants.

CIVIL ACTION FILE NO.:

**JURY TRIAL DEMANDED**

## COMPLAINT – CIVIL RIGHTS

Plaintiffs Erika Arnold, Debra Trawick, and Christine Muchene file this

Civil Rights Complaint against Accord Services LLC, Steven A. Adams, and

Katayoun "Kathy" Adams ("Defendants"), and show the following:

### INTRODUCTION

1.

This is a civil rights action for money damages and equitable and declaratory

relief brought pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981. Accord

Services LLC ("Accord" or "Accord Services") is a staffing company that hires

nurses and nurse aides to work in private homes.  Accord employs a policy of

illegal discrimination in the hiring and placement of its home healthcare employees for the express purpose of accommodating the illegal preferences of its clients. Defendants openly discussed the race and age of the nurses and nurse aides in relation to the preferences of clients.  Defendants repeatedly refused to place nurses and nurse aides for the express purpose of accommodating the race and age bias of clients. Defendants openly accommodated these illegal preferences. Defendants discriminated against black applicants and employees, including both African Americans and Africans, in favor of Caucasian and Hispanic applicants and employees.  Defendants routinely declined to place nurses and nurse aides they described as "too black" or "too foreign" or "too old."

2.

Defendants also engaged in intentional race discrimination in employment decisions concerning office staff.  Defendants also tolerated and fostered the use of racially offensive comments in the workplace.

3.

Defendants employed Erika Arnold and Debra Trawick during separate time periods.  Defendants terminated Erika Arnold because of her race (African American) and in retaliation for her protests of Defendants' racially discriminatory practices. Defendants terminated Debra Trawick in retaliation for her protests of

Defendants' racially discriminatory practices.  Defendants repeatedly refused to

hire Christine Muchene, a qualified, experienced and licensed Nurse Aide, because

of her race, national origin, and age.

4.

On November 4, 2009, Ms. Muchene filed a timely Charge of

Discrimination with the EEOC.  Upon the receipt of a Notice of Right to Sue

Letter from the EEOC, Ms. Muchene anticipates amending this action to include a

claim for race and national origin discrimination under Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e *et seq.* and a claim for age discrimination under the

Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-34 (the

"ADEA").

J<small>URISDICTION AND</small> V<small>ENUE</small>

5.

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and

1343(a)(4) and 28 U.S.C. §§ 2201 and 2202.

6.

Defendant Accord resides in the Northern District of Georgia within the

meaning of 28 U.S.C. § 1391(c).  Venue is therefore proper in the Northern

District of Georgia under 28 U.S.C. § 1391(b).

**PARTIES**

7.

Plaintiff Arnold is a citizen of the United States and a resident of Georgia. For purposes of this action, Ms. Arnold submits herself to the jurisdiction of this Court.

8.

Plaintiff Trawick is a citizen of the United States and a resident of Alabama. For purposes of this action, Ms. Trawick submits herself to the jurisdiction of this Court.

9.

Plaintiff Muchene is a permanent resident of the United States and a resident of Georgia.  For purposes of this action, Ms. Muchene submits herself to the jurisdiction of this Court.

10.

Defendant Accord Services, LLC ("Accord" or "Defendant") is a Domestic Limited Liability Company registered to do business in the State of Georgia. Accord is subject to the jurisdiction of this Court and may be served with process by serving its registered agent for service of process in Georgia, Steven A. Adams, at its registered address, 1025 Ector Drive, Kennesaw, Georgia 30152.

11.

Defendant Steven A. Adams is a citizen of the United States and a resident of Georgia.  Mr. Adams may be served with process at his residence address, 1025 Ector Drive, Kennesaw, Georgia 30152 or at Accord's business address located at Accord Services, LLC, 907 Church Street Extension, Marietta, Georgia 30060.

12.

Defendant Kathy Adams is a citizen of the United States and a resident of Georgia.  Ms. Adams may be served with process at her residence address, 1025 Ector Drive, Kennesaw, Georgia 30152 or at Accord's business address located at Accord Services, LLC, 907 Church Street Extension, Marietta, Georgia 30060.

### STATEMENT OF FACTS

13.

Accord provides private nurses and nurse aides to individuals in a home setting.

14.

Steven A. Adams is Accord's Founder, Chief Executive, and President.

15.

Kathy Adams is Accord's Co-Founder and Director of Clinical Services.

**ERIKA ARNOLD**

16.

Accord hired Ms. Arnold in June 2007 for the position of Human Resources Manager.  Ms. Arnold is African-American.

17.

Soon after Ms. Arnold began her employment, she learned of Accord's race-based employment practices.

18.

Ms. Arnold was routinely present at the daily staffing meetings.

19.

In these meetings, race-based placements were openly discussed.

20.

Several individuals attended staffing meetings, including Defendant Kathy Adams, Freddy Allen, the Administrator, and the nurse supervisor and staffing coordinators.

21.

During staffing meetings, Ms. Adams, Mr. Allen, and the nurse supervisor and staffing coordinators openly discussed the race and age of the nurses and nurse aides and the racial and age preferences of the clients.

22.

They refused to place certain nurses and nurse aides specifically to accommodate the racial and age preferences of the clients.

23.

Race-based staffing comments were made at every staffing meeting that Ms. Arnold attended.

24.

Kathy Adams, Accord Founder and Director of Clinical Services, was present during and participated in race-based placement discussions.

25.

At one point in approximately August 2007, during a Friday meeting, Ms. Arnold questioned the rationale of recruiting additional CNA (certified nurse aide) and LPN (licensed practical nurse) applicants when Accord already had abundant applications on file.

26.

Kathy Adams explained that Accord could not use the majority of the applicants because the clients had a "preference" and that Ms. Arnold needed to find nurses Accord could use to satisfy the client.

27.

Ms. Arnold objected, stating the company could not pass over an applicant because of the applicant's race.

28.

Kathy Adams responded that healthcare is a different industry, unlike the banking industry where Ms. Arnold had been working, and that it is different because it is based on the clients' preferences. Ms. Adams also said, "Those laws don't apply because it is the clients' preference and their home."

29.

Ms. Arnold researched race discrimination laws online and found no exceptions.  She then raised her concern with Freddy Allen, Accord Administrator. He said, "That's how they do it."

30.

During the staffing meetings, clients were categorized and discussed according to whether they were "American" or "Hispanic."   The race of the nurse to be placed was then discussed in connection to the race of the client.

31.

On several occasions, Ms. Arnold was told that she could not place an applicant because Accord needed a white nurse for that particular client.

32.

For example, Ms. Arnold was told they needed additional staff for a client in Ellijay, but the nurses had to be white.

33.

Ms. Arnold repeatedly protested the race-based hiring and placement of nurses.

34.

Several applicants who came in seeking work were falsely told Accord had no placements, even when it did, because in Accord's view those applicants were the wrong race or age.

35.

Ms. Arnold was told not to hire foreign nurses.

36.

For example, on one occasion an Accord client in the Smyrna area needed LPN coverage. Ms. Arnold was told she could not use the nurses that applied because they had foreign names and the client did not like that.

37.

"WG" is an Accord code word for "white girl."  Ms. Arnold heard this term used repeatedly.

38.

Ms. Arnold specifically objected to Accord's practice of accommodating the racial preferences of its clients.

39.

On one occasion, in response to Ms. Arnold's protest, Kathy Adams "explained" that Accord had "no choice" because they had "to give the client what they want."

40.

Ms. Arnold raised her objections to racial comments to Kathy Adams.

41.

In response to raising concerns about inappropriate racial and sexual comments in the workplace, Ms. Arnold was told, "We are not going to walk on eggshells for anyone."

42.

Ms. Arnold also objected to Accord's practice of paying Caucasian employees a higher rate than it paid to minority employees for the same work.

43.

Ms. Arnold also protested the company's decision to consider only Caucasian applicants for certain office positions.

44.

In response, Accord ultimately excluded Ms. Arnold from the hiring process.

45.

Applicants at Accord had to walk past a windowed conference room.  On numerous occasions Mr. Allen made comments about not being able to use a particular applicant because they were "too old" or "foreign."

46.

Accord consistently favored both Caucasian and Hispanic applicants over black applicants, whether African or African American.

47.

There were multiple occasions when Accord directed a bilingual staff member to take the on-line certification test for uncertified Hispanic applicants.

48.

In November 2008, Ms. Arnold was directed to recruit for several positions, including a recruiter, payroll clerk, and accounts receivable representative.  She was told they wanted a Hispanic, bilingual male for the Recruiter position. Mr. Allen told Ms. Arnold there would be only one black male in the office – him.

49.

Mr. Allen said some of the candidates she identified were too old.

50.

Ms. Arnold was also directed to locate an additional Nurse Supervisor for the office. At the time, Accord had several experienced nurses that worked for the company in the field who were interested in applying for the office position.  They were all African American.  During this same time period, a Caucasian nurse came in to apply for a field position. The Nurse Supervisor saw the Caucasian applicant come in and requested that she instead apply for the internal position. Ms. Arnold questioned the Nurse Supervisor as to why she did that.   The Nurse Supervisor said, "Kathy wants a WG in the office."

51.

In her capacity as Human Resources Manager, Ms. Arnold was contacted by an African American field nurse from Accord's Savannah office who called to complain that she had not been considered for an internal position. The nurse reported that she had more experience and tenure than the Caucasian woman hired by Accord.  The nurse complained that blacks were not being hired in that office.

52.

Ms. Arnold told Mr. Allen of the complaint.  He replied that, "They are not going to hire any black people in that office."

53.

Plaintiff was subjected to a racially hostile environment throughout her employment by Defendants.

54.

In March and April 2009, numerous meetings were held concerning personnel changes and certain positions Accord was seeking to fill, including Billing Representative, Receptionist, Director of Nursing, Bi-Lingual Staffing Coordinator, Payroll Clerk and Nurse Supervisor.

55.

During this process, Ms. Arnold was directed to stop bringing in applicants that were not going to be hired.

56.

She was told there was no reason to bring in black applicants, and to look at the applicant's name before setting an interview to determine if they were black or white.

57.

Freddy Allen told Ms. Arnold they wanted more white people in the office.

58.

Ms. Arnold repeatedly protested, explaining that it was not legal for the company to hire according to race.

59.

In response, Freddy Allen, Accord Services Administrator, replied: "You know how they are" and "It is their company and it's what they want."

60.

Ms. Arnold also raised her objections with the Quality Assurance Manager.

61.

Accord Services made obvious its displeasure with Ms. Arnold's ongoing protests of its employment practices.

62.

Accord Services began targeting Ms. Arnold, excluding her from meetings, stripping responsibilities, reassigning duties, limiting information on personnel decisions, and ultimately tried to force her resignation.

63.

In a meeting on or about April 25, 2009, Kathy Adams and Steve Adams unfairly accused Ms. Arnold of failing to follow an alleged company policy, despite knowledge that Ms. Arnold had followed the direct instructions of the Administrator, Freddy Allen, her direct supervisor.

64.

In this meeting, Ms. Arnold raised her belief that she was being targeted because of the discrimination issues she had raised.

65.

She again protested the company's racially discriminatory hiring process and disparate pay issues and raised her objection to the company's response to the concerns she had raised.

66.

Kathy Adams responded by telling Ms. Arnold that she complained too much – that Accord Services was just not the right place for her.

67.

Ms. Adams explained: "We started this company so we didn't have to follow anyone's rules."

68.

Kathy Adams and Steve Adams told Ms. Arnold they expected the HR person to be a company advocate, not an employee advocate.

69.

Ms. Arnold was told she could "voluntarily resign" or be demoted, and that if she took a demotion, they would hire someone else for her HR Manager position and place her into another position, but they would not say what position that would be.  Ms. Arnold refused to voluntarily resign or accept a demotion to an unidentified position.

70.

On April 29, 2009, Accord Services terminated Ms. Arnold's employment.

71.

The separation letter provided to Ms. Arnold stated no reason for the termination.

72.

Despite Ms. Arnold's request, the company refused to provide her with a Department of Labor ("DOL") separation notice.

73.

Approximately two weeks later, the company provided a separation notice to the DOL in connection with its attempts to defend against Ms. Arnold's claim for unemployment benefits, claiming that Ms. Arnold had violated a company policy.

74.

According to information provided to Ms. Arnold by the DOL, the company failed to produce the alleged policy and failed to demonstrate that Ms. Arnold had violated any company policy.

75.

Ms. Arnold's claim for unemployment benefits was granted.  Accord Services promptly replaced Ms. Arnold with a Caucasian and paid her a substantially higher salary.

76.

 All Defendants had actual knowledge of the pervasive racial comments in the workplace, but took no action to stop the conduct.

77.

The above stated actions have had the effect of subjecting Ms. Arnold to a racially hostile working environment.

78.

The above stated actions have had the effect of subjecting Ms. Arnold to disparate and adverse terms and conditions of employment relative to white employees.

79.

Defendants' actions directed toward Ms. Arnold were done intentionally, willfully, maliciously and in bad faith.

DEBRA TRAWICK

80.

Debra Trawick was employed by Accord Services from on or about June 26, 2009 until August 21, 2009.

81.

She was hired for the position of Office Manager.

82.

During her employment, she attended regular staffing meetings, meetings typically held each morning for purposes of coordinating the placement of nurses and nurse aides for the clients of Accord Services.

83.

During these meetings, Kathy Adams, Freddy Allen, the nurse supervisor and the staffing coordinators openly discussed the race and age of the nurses and nurse aides and the age and racial preferences of the clients.

84.

They refused to place certain nurses and nurse aides specifically to accommodate the racial and age preferences of the clients.  They discussed this openly.  Some clients preferred Caucasian nurses and nurse aides.  Some preferred younger nurses and nurse aides.  Accord Services openly accommodated these preferences.

85.

Accord Services routinely declined to place nurses and nurse aides they described as "too black" or "too ghetto" or "too old."

86.

In making placement decisions, the following types of comments were routinely made in the staffing meetings:

- "we can't use her, she is too black"
- "you gotta put a WG in there"
- "you gotta staff him with a WG because you know he doesn't want a black person"
- "we can't use her, she is missing a tooth and too ghetto"

- "She is 'too old'"
- "He only wants 'young girls'"

87.

"WG" is Accord Services code for white girl.  Ms. Trawick heard this term

used repeatedly.

88.

Ms. Trawick reported this situation to Elizabeth "Bess" Brown, the Accord

Services Human Resources Director during this time period.

89.

In early July, Ms. Trawick told Ms. Brown she needed to come to the

meetings to see what was going on – that race was openly discussed and that

nurses were rejected because they were deemed "too black" or "ghetto."

90.

Ms. Trawick reported her objections to placement based on skin color and

also reported her offense at the racial comments.

91.

Ms. Brown agreed to set a meeting to discuss Ms. Trawick's concerns, but

never did so.

92.

Ms. Brown told Ms. Trawick they were both new and needed to earn Steve and Kathy's trust by doing what they expect and to not make problems.

93.

Ms. Brown took no action to stop the offensive racial comments or end the race-based placement practices.

94.

Ms. Trawick continued to be subjected to the offensive racial comments commonplace at Accord Services.

95.

For example, Mr. Allen referred to Ms. Trawick's son as a "mixed boy."

96.

Mr. Allen added that Steve Adams had seen her son and that Mr. Adams had commented to him, "Is there something wrong with you, you can really pick them can't you."  Mr. Allen explained that he had a history of hiring "white girls" that liked or married black men, and this was the basis for Mr. Adam's comment.

97.

Mr. Allen also told Ms. Trawick that he once dated a "white girl" and that Kathy Adams and Steve Adams made him feel very uncomfortable about dating her.

98.

On or about July 10, Mr. Allen and the nurse supervisor were in the office talking about sex and commenting about "white girl" body parts. Ms. Brown walked by during this conversation, but took no action to address the inappropriate comments.

99.

Ms. Trawick went to Ms. Brown the next work day and protested the racial comment. Ms. Trawick asked Ms. Brown what she intended to do about the situation. Ms. Brown responded by explaining that Ms. Trawick would have to put up with it if she expected to stay with the company.

100.

Ms. Brown added, "I am not talking to you as HR, but as a new hire like you. We both have to be careful."

101.

Ms. Brown also made comments about how she and Ms. Trawick had both come from a corporate environment where things were run a certain way, but that Accord Services was a mom-and-pop company. She added: "We are going to have to tolerate things we would not normally have to tolerate if we want to stay."

102.

Ms. Trawick was immediately retaliated against for her reports of and objections to discrimination at Accord Services.

103.

Prior to Ms. Trawick's complaint to Ms. Brown, she was given a written weekly schedule.

104.

After Ms. Trawick's complaint to Ms. Brown, she was never given another schedule.

105.

Kathy Adams began avoiding Ms. Trawick and stopped giving her work.

106.

In response to Ms. Trawick's request for work assignments, she was told to see Freddy Allen, but he too ignored her and refused to provide work assignments.

107.

When Ms. Trawick spoke to Mr. Allen, he would simply walk by and not respond at all.

108.

When he did speak, he was openly contentious.

109.

Ms. Trawick sat at her desk for days with no work.

110.

On August 21, 2009, Ms. Adams and Ms. Brown told Ms. Trawick her employment was terminated.

111.

They told Ms. Trawick she was not a "team player."

112.

Defendants' retaliatory termination of Ms. Trawick was done intentionally, willfully, maliciously and in bad faith.

CHRISTINE MUCHENE

113.

Christine Wathiva Muchene was born in Kenya on March 9, 1957.  She is a permanent legal resident of the United States.

114.

Ms. Muchene is an experienced and certified nurse's aide.

115.

At all times relevant to her claims in this suit, Ms. Muchene held a Georgia Nurse Aide Registry certification card issued by the Georgia Department of Community Health.

116.

Ms. Muchene also had a Patient Care Technician license from NCCT which is higher than a nurse aid.

117.

Ms. Muchene first completed an application for employment with Accord Services in 2007.

118.

Ms. Muchene held all the required qualifications for the position of nurse aide with Accord Services.

119.

Ms. Muchene provided all the documentation required by Accord Services, including her Georgia Nurse Aide Registry certification card, CPR Certification, and First Aid (FA) card.

120.

Ms. Muchene met in person with a human resources employee who confirmed that her application was complete.  She also provided car insurance to prove she had reliable transportation to the clients' locations. In addition, she provided Accord with a criminal background check.

121.

Ms. Muchene was told her application would remain active and that she would be contacted for placement when Accord Services received a request for a nurse aide.

122.

In 2008, Ms. Muchene went in person to the offices of Accord Services to update her application.

123.

Ms. Muchene also contacted Accord Services in person and by telephone (multiple times) to follow up on her application.

124.

On each occasion she was told that her application was complete and active in their system – that she would be contacted if a placement opportunity for a nurse aide became available.

125.

In March 2009, Ms. Muchene learned that Accord Services was actively recruiting nurse aides.

126.

Ms. Muchene had personally observed postings by Accord Services recruiting nurse aides. The postings were on the roadside on Church Street near Kennestone Hospital where they (Accord) have their new offices. The signs said "Now Hiring CAN's and LPN's."

127.

Ms. Muchene again went to Accord Services in person to again confirm that her file was active and to make sure Accord Services knew she was still seeking work. The job postings for CNA's and LPN's were still on the roadside.

128.

Ms. Muchene spoke with a representative of the company who checked the records and confirmed that her application was active.

129.

Ms. Muchene also provided Accord Services with an updated copy of her Georgia Nurse Aide Registry certification card, driver's license and CPR/FA certification.

130.

Ms. Muchene told Accord Services she was available anytime.

131.

Afterwards, Ms. Muchene called approximately twice a week to see if there were any placement opportunities.

132.

Ms. Muchene also went by in person to inquire about open positions.

133.

In late June/July 2009 time frame, Ms. Muchene asked Debra Trawick (an employee of Accord Services at that time) to check on the status of her application.

134.

Ms. Trawick confirmed that her application was complete and told her to keep calling.

135.

Instead of hiring Ms. Muchene, Accord Services hired a significantly younger less qualified white applicant for a new placement opportunity as a nurse aide during the August 2009 time frame.

136.

The applicant Accord Services elected to hire had no prior experience as a nurse aide. She also did not possess a Georgia Nurse Aide Registry certification card at the time she was offered a placement as a nurse aide. Accord Services facilitated the process of obtaining a certification for this applicant.

137.

At the time this applicant was hired, Ms. Muchene's application was active, and she was seeking the position. Ms. Muchene already possessed the required training and license, as well as substantial experience as a nurse aide.

138.

Ms. Muchene was substantially more qualified than the young Caucasian applicant hired by Accord Services.

139.

Accord Services had multiple new clients for whom they were placing nurse aides during the July-August 2009 timeframe.

140.

Accord Services refused to offer any of these positions to Ms. Muchene because of her age, race and national origin.

141.

When Debra Trawick, a current employee of Accord Services at that time, inquired as to why Ms. Muchene was not offered a placement, she was told they preferred younger nurses – in their 20s and 30s.

142.

Accord Services specifically avoided hiring African nurses.

143.

Ms. Trawick was told that Ms. Muchene's accent was an issue.

144.

During the timeframe that Ms. Muchene was denied employment, Accord Services has an open practice of accommodating the racial preference of customers, that only "white girls" would be placed in certain open positions because  certain customers would not accept non-white nurses.

145.

Defendants routinely declined to place nurses and nurse aides they described as "too black."

146.

During the timeframe that Ms. Muchene was denied employment, Accord Services has an open practice of accommodating the age biased preferences of certain customers who would only accept younger nurses.

147.

Defendants routinely declined to place nurses and nurse aides they described as "too old."

148.

Defendants routinely declined to place nurses and nurse aides they described as "too foreign."

149.

Accord's staffing coordinators would pull applications and select names that sounded "American."

150.

To date, Accord Services has not offered Ms. Muchene a single placement for work as a nurse aide, despite her objectively superior qualifications and experience.

151.

Defendants' actions toward Ms. Muchene were done intentionally, willfully, maliciously and in bad faith.

## COUNT ONE
### DISCRIMINATION IN VIOLATION OF § 1981

152.

The allegations contained in paragraphs 1 through 151 are incorporated by reference.

153.

Defendants' actions in terminating Plaintiff Arnold because of her race were committed intentionally and in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

154.

Defendants' actions in refusing to hire Plaintiff Muchene because of her race were committed intentionally and in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

155.

The actions taken against Plaintiffs Arnold and Muchene have caused them to suffer both monetary and non-monetary damages.

156.

Plaintiffs Arnold and Muchene are entitled to equitable and monetary relief from Defendants for these violations of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

## COUNT TWO
## HOSTILE WORK ENVIRONMENT IN VIOLATION OF § 1981

157.

The allegations contained in paragraphs 1 through 151 are incorporated by reference.

158.

Defendants' actions in creating, fostering, and tolerating a racially hostile working environment were committed intentionally and in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

159.

The racially hostile working environment caused Plaintiffs Arnold and Trawick to suffer emotional distress.

160.

Plaintiffs Arnold and Trawick are entitled to compensatory damages from Defendants for these violations of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

## COUNT THREE
## <u>RETALIATION IN VIOLATION OF § 1981</u>

### 161.

The allegations contained in paragraphs 1 through 151 are incorporated by reference.

### 162.

Defendants' actions in terminating Plaintiff Arnold's employment following her complaints of discrimination were committed with reckless disregard for Ms. Arnold's right to be free from discriminatory treatment on account of her opposition to discriminatory practices and in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

### 163.

Defendants' actions in terminating Plaintiff Trawick's employment following her complaints of discrimination were committed with reckless disregard for Ms. Arnold's right to be free from discriminatory treatment on account of her opposition to discriminatory practices and in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

### 164.

The actions taken against Plaintiffs Trawick and Arnold have caused them to suffer both monetary and non-monetary damages.

165.

Accordingly, Plaintiffs Trawick and Arnold are entitled to the equitable and monetary relief set forth in the following prayer for relief for Defendants' violation of their rights under the Civil Rights Act of 1866, 42 U.S.C. § 1981.

## COUNT 4
## VIOLATION OF 42 U.S.C. § 1985(3)

166.

The allegations contained in Paragraphs 1 through 151 are incorporated by reference.

167.

Defendants Accord Services, LLC, Steven A. Adams and Kathy Adams conspired with clients, for the purpose of depriving, either directly or indirectly, Plaintiffs of the equal protection of the laws, or equal privileges and immunities under the laws, specifically, their rights under 42 U.S.C. § 1981.  Specifically, Accord Services, LLC, Steven A. Adams and Kathy Adams conspired with their clients to hire and fire employees based on race.  This is a violations of those employee's rights under federal law and was in violation of Plaintiffs' rights under federal law and in particular 42 U.S.C. § 1981.

168.

Defendants' actions in conspiring to violate Plaintiffs' civil rights were committed with reckless disregard for their civil rights.

169.

The actions taken against Plaintiffs have caused them to suffer both monetary and non-monetary damages.

170.

Accordingly, Plaintiffs are entitled to the equitable and monetary relief set forth in the following prayer for relief for defendants by a conspiracy to violate their civil rights under 42 U.S.C. § 1985(3).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court grant the following relief:

(a)     That Plaintiffs be awarded a declaratory judgment that Defendants are in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981;

(b)     That Plaintiffs be granted judgment against Defendants, as requested, under Counts I through IV;

(c)      That this Court issue a permanent injunction against Defendants, prohibiting them, separately or together, from engaging in any employment practice or policy which discriminates against Plaintiffs or others similarly situated

because of their race, opposition to discriminatory or unlawful practices, or because of their participation in this lawsuit;

(d)     That Plaintiffs have and recover from Defendants back pay and benefits, with prejudgment interest thereon;

(e)     That Plaintiffs have and recover compensatory damages in an amount to be determined by a jury;

(f)     That Plaintiffs have and recover punitive damages against each Defendant in an amount reasonable and commensurate with the harm done and calculated to be sufficient to deter such conduct in the future;

(g)     That Plaintiffs have and recover their costs in this action and a reasonable attorneys' fee as provided by law; and

(h)     Any and other such further relief that this Court or the Finder of Fact deems equitable and just.

**PLAINTIFFS DEMAND A TRIAL BY JURY.**

Respectfully submitted,

BUCKLEY & KLEIN, LLP

By:    /s/ Dena G. George
       Dena G. George
       Ga. State Bar No. 297337
       dggeorge@buckleyklein.com
       Edward D. Buckley
       Ga. State Bar No. 092750
       edbuckley@buckleyklein.com

       Attorneys for Plaintiffs

Suite 1100, 1180 West Peachtree Street
Atlanta, Georgia 30309
Telephone:   404-781-1100
Facsimile:   404-781-1101


## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that the foregoing has been prepared in

Times New Roman (14 point) font, as approved by the Court in LR 5.1B.

BUCKLEY & KLEIN, LLP

By:    /s/ Dena G. George
       Dena G. George
       Ga. Bar No. 297337
       Attorneys for Plaintiff